CARLISLE B. ROBERTS, Judge.
 

 Plaintiff appealed from defendant’s Order No. IH 77-12, dated December 20, 1977. In that order, defendant sustained the inheritance tax auditor’s valuation of the subject property and determined that plaintiff owed additional inheritance taxes based upon that assessment.
 

 The subject property consists of 101.83 acres of land to the west and slightly south of Eugene, identified in the county assessor’s records as Tax Lot 18-5-23-600. (The entire parcel of land covers 119.83 acres, but 18 acres are not timbered and their value is not at issue here.) The value of the timber is not contested; only the value of the timberland, along with any nonmer-chantable timber thereon, is involved in this suit. The property was and is zoned AGT (agriculture, grazing and timber). This zoning provides for either 5-acre or 20-acre minimum-sized parcels.
 

 
 *[3]
 
 On April 19, 1968, the decedent, Hilda Tollefson, transferred the subject property to her son and daughter-in-law, Mr. and Mrs. George Tollefson, but decedent retained a life estate in the property, which she held at her death on August 18, 1975.
 
 [1]
 

 The value of property for inheritance tax purposes is its true cash value as of the date of the decedent’s death. ORS 118.150(1) (1973 Replacement Part); OAR 150-118.150(1). Defendant contended in its initial appraisal and in its pleadings that the true cash value of the property was $500 per acre, or $50,900 for the total tract of land. Plaintiff alleged at the Department of Revenue hearing and in his complaint that the true cash value of the property was not greater than $100 per acre, or $10,180. At trial, plaintiff’s witnesses gave value estimates ranging from $75 per acre to $128 per acre. Defendant’s two witnesses estimated the value of this property at $500 to $510 per acre. These discrepancies once again illustrate the highly subjective quality of the concept of value. However, the court is not confined by the values alleged by the parties. Rather, it is the court’s duty to determine value based upon the preponderance of the evidence presented. ORS 305.427; ORS 305.435;
 
 Noyes v. Dept. of Rev.,
 
 7 OTR 325, 329 (1978).
 

 At the trial, several witnesses gave their opinion of the subject property’s market value as of the August 18, 1975, assessment date. For the plaintiff, both Mr. and Mrs. George Tollefson, the current owners of the subject property, estimated that the market value of the subject property was between $80 and $110 per acre at the assessment date. These estimates were based upon their familiarity with the property, the lack of any legal or physical access to the subject other
 
 *[4]
 
 than through their own farm property, and upon reference to 80 adjacent, similar acres of timberland, owned by Mr. and Mrs. Tollefson, which was assessed by the county for tax purposes at less than $80 per acre.
 

 In addition to Mr. and Mrs. George Tollefson, two expert witnesses, both private forester-consultants, offered their opinions of the fair market value of the subject property at the date of death. After considering the past and present use of the property, its slope and elevation, zoning, location, and lack of road access and water, both experts found the highest and best use of the property was for timber production. Each utilized the market data approach, relying on sales of what they deemed to be comparable properties. They arrived at comparable bare land values by a residual approach. In this approach, plaintiff’s appraisers subtracted the value of the "merchantable” timber from the sales price of the comparable property to arrive at an indicated value for the bare land and nonmerchantable (or "reproduction”) timber for each comparable property. The appraisers then adjusted the indicated residual amount for each comparable property to account for differences (such as site class and time of sale) between each comparable and the subject. Utilizing this approach, plaintiff’s first expert witness arrived at an indicated land value of $128 per acre, or $13,065. Plaintiff’s second expert witness arrived at an indicated value of $75 per acre, a total value of $7,635. The court believes the value arrived at by plaintiff’s first expert witness, $13,065, is the more reliable one because it is based on a clearer analysis of the subject property and of comparable sales.
 

 Two expert witnesses testified for the defendant and expressed their opinions of the market value of the subject property as of the assessment date.
 

 The first expert had performed a preliminary value estimate for inheritance tax purposes for the Department of Revenue. Utilizing a recent aerial
 
 *[5]
 
 photograph of the subject property and relying on figures taken from the ad valorem tax rolls, he estimated the value of the subject property to be $500 per acre at the assessment date. This approach is not deemed reliable. An appraisal of property involves more than merely adjusting previously computed values to the appropriate assessment date. As this court noted in
 
 Starker v. Dept. of Rev.,
 
 6 OTR 10, 17 (1975):
 

 "In this particular instance, the procedures of the defendant’s Timber Section, applied to gift taxes, although based on a wealth of data, did not impart conviction. As one of counsel for plaintiff stated:
 

 " 'In summary, defendant’s mechanical approach to valuation of the timber and timberlands, which ignores the actual expenses in harvesting the timber on the Starker tracts, may have some justification in the property tax field where practical tax administration might require a generalized approach and where rough equality among taxpayers is sought, but it has no justification in contested gift [or inheritance] tax cases, where the question presented is solely and clearly the question of the true cash value of the property given, to be determined as of the date of gift.
 

 Defendant’s second witness, an appraiser for the Assessment and Appraisal Division of the Department of Revenue, prepared two appraisal reports concerning the subject property. The first report, dated June 27, 1977, was not offered by defendant at trial, but was placed in the record by the plaintiff. (PI Ex 9.) In that report, the appraiser found that the highest and best use of the subject property was its present use of timber production and farming. After considering all three approaches to value (cost, income and market), he relied on the market data approach for his final value estimate. He also utilized the residual technique to arrive at the value of the land, subtracting the estimated value of the merchantable timber from the sales price of each comparable property. He then adjusted the residual land values for such variables as
 
 *[6]
 
 time, size, location, and quality of access, and arrived at an estimated land value of $550 per acre.
 

 In his second appraisal report, dated November 3, 1978, and offered into evidence by the defendant, the appraiser also utilized the market data approach. In this report, however, he deemed the highest and best use of the subject property to be "rural residential with timber production and farming as added benefits. * * *” (Def Ex A, at 7.) Using the residual technique, and adjusting the comparables to the subject for certain variables, defendant’s appraiser arrived at an indicated value for the subject property of $510 per acre.
 

 The wide discrepancies between the values contended by plaintiff’s witnesses (approximately $100 per acre) and defendant’s expert witnesses (approximately $500 per acre) may be explained by careful study of the testimony of the several witnesses and by recognizing that these discrepancies demonstrate the high degree of subjectivity inherent in the appraisal process. The discrepancies can partially be explained by, and point out the weaknesses of, the "residual” method of valuing timberland. Under the residual technique, the value of the timberland is determined by subtracting the estimated value of the timber from the total price paid for the comparable property. Thus, any error in estimating the value of the timber will cause the resulting land value also to be misstated. An understatement of the estimated timber value will cause the residual land value to be overstated, and vice versa.
 

 In the present case, plaintiffs estimate of "merchantable” timber included all timber with a diameter of eight inches or greater (as found in the marketplace), while defendant’s estimate of merchantable timber included only timber having a diameter of 12 inches or greater (following ORS 321.605(10) and (11) (1973 Replacement Part)). Under the residual technique, it is clear that plaintiff’s approach will yield a
 
 *[7]
 
 higher estimated timber value, and therefore a lower residual land value, than will defendant’s approach. Thus, while both defendant’s and plaintiff’s estimated values included an amount attributable to the bare land, defendant’s value of around $500 per acre also includes the value of all timber having a diameter of less than 12 inches, while plaintiff’s value of about $100 per acre includes, in addition to a bare land value, the value of timber less than eight inches in diameter. It is probable that the value of the timber between 8 and 12 inches in diameter accounts for much of the difference between the two valuations.
 

 In this case, the court’s role is to determine the fair market value of the bare land and the nomnerchantable timber
 
 in the market.
 
 The Department of Revenue does not establish the "market” for timber or timberland. Instead, willing buyers and willing sellers involved in arm’s-length transactions in the timber market do so. The timber market, composed of buyers and sellers of timber and timberland, generally treats timber having a diameter of eight inches or greater as "merchantable.” That being the case, this court finds that plaintiffs approach of including in the bare land value only "nonmerchantable” timber (i.e., having a diameter of less than eight inches) is more reasonable and convincing than defendant’s approach.
 
 [2]
 

 Finally, the chasm between plaintiffs and defendant’s value contentions is partially due to their disparate opinions as to the subject property’s highest and best use. Plaintiff consistently contended the highest and best use was the property’s present use of timber production. Defendant contended at trial that
 
 *[8]
 
 the property’s highest and best use was for rural homesites, with timber production and farming as merely "adjunct” benefits.
 

 This court believes that the highest and best use of the subject property at the date of death was its current and historic use of timber production. The justification given by defendant’s appraiser for his opinion of the highest and best use was that a potential existed, because of favorable zoning and rapid population growth in the area, for dividing the property into smaller sized parcels. It is true that the highest and best use of property may change with time and circumstances, so that its current use will no longer be its highest and best use.
 
 See Oregon Broadcasting v. Dept. of Rev.,
 
 7 OTR 379 (1978)
 
 modified
 
 287 Or 267, 598 P2d 689,
 
 rehearing denied 287
 
 Or 499, 601 P2d 473 (1979). The physical features of the property, any legal, contractual, or economic constrictions on the use of the site, and market conditions such as supply and demand, may all have a bearing on highest and best use, and should be considered in making that decision.
 

 In the present case, it is
 
 possible
 
 the property could be subdivided, since the zoning allowed for either 5-acre or 20-acre tracts. (The basis for a determination of the choice between 5 or 20 was not made clear in the record.) However, the mere
 
 possibility
 
 of subdividing the property into rural homesites is not enough to support a finding that this constitutes the property’s highest and best use. The requirement of valuation of property at its highest and best use does not sanction the adoption of merely speculative uses.
 
 Williams v. Commission,
 
 1 OTR 265, 269 (1963). Instead, the highest and best use for land is
 
 the use that, at the time of the appraisal, is the most profitable likely use.
 
 * * *” American Institute of Real Estate Appraisers,
 
 The Appraisal of Real Estate
 
 43 (7th ed 1978). When preparing market value estimates, appraisers should limit themselves to highest and best use considerations that have a strong, present probability of
 
 *[9]
 
 achievement; i.e., the most
 
 likely use
 
 at the time.
 
 The Appraisal of Real Estate, supra,
 
 136-138. More remote possibilities that may occur to the informed buyfer or seller must be given less weight.
 

 Defendant’s contended highest and best use (subdividing the property for rural homesites) was not supported by evidence that the subject property was presently desirable for such purpose. No evidence of 5-acre rural homesite tracts in the immediate area was introduced at trial. Further, it appears from the testimony of plaintiff’s appraiser that the subject timberland is part of and contiguous to a block of approximately 1,800 acres of timbered land which has remained in timber production for a long period and constitutes an economic undertaking of a high order. Finally, plaintiff has convinced this court that certain characteristics of the subject property, including lack of road access, the lack of a sufficent water supply, the steep slope of the land, and the existing soil conditions make it highly unlikely that, at some time near the assessment date, the property could.feasibly have been subdivided into rural homesites for sale in quantify in competition with other sites in the area. The commercial use of the property for homesites or rural tracts is premature.
 

 Having considered all the evidence before it, the court finds that plaintiff’s valuation approach is the more reasonable, and consequently finds the true cash value of the subject property on August 18, 1975, was $13,065. Defendant’s Order No. IH 77-12 is modified in accordance with this decision and its Estate Audit Section assessment shall be modified and reissued. If any tax in excess of the amount found necessary by this decision has been paid, it shall be refunded pursuant to ORS 118.171 (1977 Replacement Part).
 

 Plaintiff is entitled to his statutory costs and disbursements.
 

 [1]
 

 There is some inconsistency in the records as to the date of death. The assessment prepared by defendant’s Estate Audit Section appraises the subject property as of August 8, 1975. At trial, counsel referred to both August 8 and August 18,1975, as the date of death. Since the difference of ten days is insignificant, it can be ignored, and the court will assume August 18, 1975, as the date of death.
 

 [2]
 

 Had the Department of Revenue valued timber having a diameter of eight inches or greater as being merchantable timber, it is quite conceivable that it would have assigned a much higher valuation to the timber portion than the $160,800 it originally assessed. However, plaintiff has only challenged the value of the land and the reproduction and has not challenged the timber valuation. Thus, this court is powerless to add to the merchantable timber value, since that value is not at issue.
 
 Nepom v. Dept. of Revenue,
 
 272 Or 249, 536 P2d 496 (1975); ORS 305.435.